```
                                                           U.S. DISTRICT COURT
                                                          DISTRICT OF VERMONT
                                                                 FILED
            UNITED STATES DISTRICT COURT               2014 APR 16 PM 1:38
                       FOR THE
                DISTRICT OF VERMONT
                                                            CLERK
                                                       BY_____
                                                            DEPUTY CLERK
```

TIMOTHY C. JOHNSTON and      )
ZAPATA COURAGE,              )
                             )
    Plaintiffs,              )
                             )
    v.                       )    Case No. 5:13-cv-229
                             )
CONNECTICUT ATTORNEYS        )
TITLE INSURANCE CO., JON S.  )
SVITAVSKY, and CHERYL JIMMO, f/k/a )
SVITAVSKY,                   )
                             )
    Defendants.              )

**OPINION AND ORDER GRANTING DEFENDANT CONNECTICUT ATTORNEYS TITLE INSURANCE CO.'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Docs. 7, 12)

This matter comes before the court on the motion for summary judgment filed by Defendant Connecticut Attorneys Title Insurance Co. ("CATIC") and the cross-motion for partial summary judgment filed by Plaintiffs Timothy C. Johnston and Zapata Courage ("Plaintiffs"). Plaintiffs seek a declaration of coverage under a CATIC owner's title insurance policy #OP1413352 (the "Policy") which Plaintiff Johnston purchased in conjunction with his acquisition of certain real property located in Ripton, Vermont (the "Property"). Plaintiffs claim coverage is available under the Policy because the United States Forest Service ("USFS") issued them a letter, demanding the removal of certain structures on the Property that allegedly encroach on federal lands.

CATIC moves for summary judgment in its favor, arguing there has been no forced removal and that the Policy's survey exception applies and excludes coverage for any facts which an accurate survey or personal inspection of the land would disclose. CATIC seeks summary judgment on Plaintiffs' claim for breach of the implied covenant

of good faith and fair dealing on the ground that no breach of the covenant may be found because CATIC was merely asserting its contractual rights when it advised Plaintiffs not to prompt the USFS to file suit. (Doc. 7.)

Plaintiffs cross-move for partial summary judgment in their favor. (Doc. 12.) They contend that there has been a forced removal under the Policy and the survey exception either does not exclude coverage, is unconscionable, or renders the forced removal provision illusory.

The court heard oral argument on January 21, 2014. Plaintiffs are represented by William L. Durrell, Esq. CATIC is represented by Michael J. Harris, Esq.

## I.   Procedural Background.

In Counts I-IV of their Complaint, Plaintiffs allege claims of breach of warranty, consumer fraud, fraud and deceit, and negligent misrepresentation against Defendants Jon S. Svitavsky and Cheryl Jimmo, f/k/a Svitavsky. In Count V of their Complaint, they seek a declaratory judgment that "CATIC has the duty to defend and indemnify Johnston against any claims made by the USFS and/or the United States of America for trespass, encroachment or similar claims under the terms of the title insurance policy at issue." (Doc. 1 ¶ 57.) In Counts VI, VII and VIII, Plaintiffs allege breach of contract, bad faith, and breach of the implied covenant of good faith and fair dealing against CATIC. On January 21, 2014, Plaintiffs withdrew their bad faith claim against CATIC. At issue in the cross motions are Plaintiffs' remaining claims against CATIC, each of which arises from either the Policy or CATIC's handling of Plaintiff Johnston's claim under the Policy.

## II.   The Undisputed Facts.

### A.   The Policy.

The Policy provides coverage to Plaintiff Johnston as follows:

OWNER'S COVERAGE STATEMENT

This Policy insures your title to the land described in Schedule A—if that
land is a one-to-four family residential lot or condominium unit.

> Your insurance as described in this Coverage Statement, is effective on the Policy Date shown in Schedule A.
>
> Your insurance is limited by the following:
>
> - Exclusions on Page 2
> - Exceptions in Schedule B
> - Conditions on Pages 2 and 3

(Doc. 1-5 at 1.) The Policy defines "title" as "the ownership of your interest in the land, as shown in Schedule A." *Id.* at 2. Schedule A references the July 19, 2002 Svitavsky/Jimmo-to-Johnston deed and sets forth the property description contained therein.

Immediately following the "OWNER'S COVERAGE STATEMENT" is a list of "COVERED TITLE RISKS," which provides coverage for certain identified title risks, including the following:

> 11. Your title is unmarketable, which allows another person to refuse to perform a contract to purchase, to lease or to make a mortgage loan.
>
> 12. You are forced to remove your existing structure—other than a boundary wall or fence—because:
>
>     a.  it extends on to adjoining land or on to any easement
>     b.  it violates a restriction shown in Schedule B
>     c.  it violates an existing zoning law
>     d.  any portion of it was built without obtaining a building permit from the proper government office or agency.

*Id.* at 1.

Schedule B of the Policy contains three general exceptions, identified as exceptions A, B and C, which apply by default unless the insured and CATIC negotiate their removal. Plaintiff Johnston and CATIC agreed to delete exceptions A and C, but retained exception B, the survey exception.

The survey exception provides: "This Policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of . . . [a]ny facts which an accurate survey or personal inspection of the land

3

would disclose." *Id.* at 5. The Policy defines "land" as "the land or condominium unit described in Schedule A and any improvements on the land which are real property." *Id.* at 2.

The Policy also excludes from coverage any "Title Risks . . . that are created, allowed or agreed to by [the insured]." *Id.*

The Policy sets forth CATIC's "choices" in the event of a claim:

OUR CHOICES WHEN YOU NOTIFY US OF A CLAIM

After we receive your claim notice or in any other way learn of a matter for which we are liable, we can do one or more of the following:

a. Pay the claim against your title.
b. Negotiate a settlement.
c. Prosecute or defend a court case related to the claim.
d. Pay you the amount required by this Policy.
e. Take other action which will protect you.
f. Cancel the coverage described in Items 12d or 18 of Covered Title Risks by paying the amount of the insurance specified in the given items as the limit for the particular covered risk, and only those costs, attorneys' fees and expense incurred up to that time which we are obligated to pay.
g. Cancel this Policy by paying the Policy Amount, then in force, and only those costs, attorneys' fees and expenses incurred up to that time which we are obligated to pay.

*Id.*

### B. The Alleged Encroachments.

In 2002, Plaintiff Johnston purchased the Property from Defendants Jon S. Svitavsky and Cheryl Jimmo, f/k/a Svitavsky.[1] The Property consists of an approximately seventeen-acre parcel of land upon which Plaintiffs' residence is located. It is bounded on the east, south, and west by federal lands maintained by the USFS.

On May 4, 1999, while Defendants Svitavsky and Jimmo still owned the Property, a USFS agent filed a "PRELIMINARY REPORT OF SUSPECTED

---

[1] Plaintiff Johnston subsequently married Zapata Courage, who is named as a co-plaintiff due to any marital homestead rights she may have in the Property.

4

ENCROACHMENT" (the "Preliminary Report"), which states that "[a]n addition was built onto house adjacent to Govt. Land that crossed the boundary line. Propane tanks are also across the line." (Doc. 1-2 at 1.)

On November 17, 2010, Plaintiff Johnston received a letter from the USFS, advising him that it would have a survey crew working in the area and that "[i]nitial reconnaissance indicates that your buildings are very close to the boundary line." (Doc. 1 ¶ 18.) On January 21, 2011, Plaintiff Johnston received a letter from the USFS stating, in pertinent part:

> As I believe you are aware, a recent survey of the common boundary between your lands and National Forest lands (portion of U.S. Tract 503c) in Ripton revealed that the westerly portion of your house as well as a utility service box and a portion of a propane tank encroach onto U.S. Tract 503c. I am enclosing a drawing that our surveyors have done showing the extent of the encroachment.

(Doc. 1-6 at 1.) The survey drawing indicates that approximately four feet of an addition on the residence, a utility service box, and a small portion of a propane tank (collectively the "Encroachments") are located on federal land. *Id.* at 2.

Plaintiff Johnston contends that the USFS letter constituted a "Covered Title Risk[]" under paragraph 12.a. of the Policy, which provides coverage in the event the insured is "forced to remove [an] existing structure" because "it extends on to adjoining land." (Doc. 1-5 at 1.) In February 2012, he submitted a claim under the Policy, which CATIC denied in a March 2012 letter stating, *inter alia*, that the "Encroachments fall within the Survey Exception" and there had been no "'forced removal.'" (Doc. 7-4 at 2-3.)

Between May and October 2012, Plaintiff Johnston filed and pursued an application under the Small Tracts Act, 16 U.S.C. § 521d, with the USFS seeking to resolve the dispute through a land exchange. On October 26, 2012, the USFS rejected the application in a letter, stating:

> We have previously provided you with a complete record of survey data and maps related to the area and the items in question. **This letter serves**

5

> **as formal notice** to remove all materials\structures you have located on National Forest System land. Specifically, perform the following:
>
> 1. Remove from Federal property all improvements related to your home at 155 Norton Farm Road, Ripton, VT including a portion of your home, propane tank and any lines associated with such.
>
> 2. Consult with the Rochester District Ranger and staff regarding the necessary site restoration needed to restore the site to a natural state which may include the removal or addition of fill, spreading of loam, grading, and planting of native seed mix or plants.
>
> Please remove these items and complete restoration work by May 31, 2013. If you feel this timeframe is not adequate you may provide, for our review and approval, a detailed alternative schedule for the completion of this action. If you have not completed this work by the above date we will proceed accordingly.

(Doc. 1-7 at 2.)

On November 5, 2012, Plaintiffs' counsel petitioned CATIC to re-open the claim and stated that he had "advised [Plaintiff] Johnston that his best course of action is to let the [USFS] know that a lawsuit will be necessary in order to trigger any rights he has under his CATIC policy." (Doc. 1 ¶ 29.) On November 8, 2012, CATIC denied the petition to re-open the claim, and warned that inviting "litigation to trigger coverage of the claim may be considered to be a violation of" the provision excluding "Title Risks that are created, allowed or agreed to by the Insured." (Doc. 1-8 at 1) (internal quotation marks omitted).

Plaintiffs have neither complied with the USFS's order to remove the Encroachments and restore the land, nor has the USFS taken any further action. Specifically, the USFS has not instituted a suit or administrative proceeding to force compliance with the terms of its October 26, 2012 letter.

### III. The Disputed Facts.

Defendants Svitavsky and Jimmo admit that a USFS agent may have filed the Preliminary Report in 1999, but they deny that it was filed in a place accessible to the

6

public and they deny ever seeing or receiving it. They contend that the alleged Encroachments were built before they owned the Property. All parties agree that these disputed facts are immaterial to the resolution of the pending motions for summary judgment.

Plaintiffs dispute that a "survey" would have disclosed the Encroachments because the Policy does not define the term "survey," which Plaintiffs contend generally merely reveals a real property's metes and bounds. They assert that only a "survey plat" would reveal the Encroachments. In support of this argument, Plaintiffs submit Vermont's Administrative Standards for the Practice of Land Surveying which state that: a "land surveyor who conducts a survey shall, when contracted for by the client, prepare a plat showing the results of the survey and shall furnish a copy to the client." (Doc. 11-4 at 4.) A "survey plat" shall include "[v]isible encroachments onto or from adjoining property or streets and the extent of such encroachments." *Id*.

In its reply, CATIC contends for the first time that the USFS's survey was actually a "sketch" and that Plaintiffs have failed to establish there is any actual encroachment on USFS land. Plaintiffs counter that this belated dispute regarding the facts is at odds with CATIC's argument that an accurate survey would have revealed the Encroachments. Neither party provided either a survey or survey plat of the Property for the court's consideration.

IV.   **Conclusions of Law and Legal Analysis.**

    A.   **Standard of Review.**

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986) (internal quotation marks omitted). In deciding the motion, the trial court must

resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

### B. Whether There Has Been a Forced Removal.

CATIC seeks summary judgment, arguing there has been no forced removal and thus coverage under the Policy has not been triggered. Plaintiffs seek summary judgment on this same ground, contending that the USFS's unequivocal demand that Plaintiffs remove the Encroachments constitutes a forced removal.

The Policy insures only Plaintiffs' ownership interest in the land and improvements actually conveyed under the Svitavsky/Jimmo-to-Johnston deed; it does not generally insure title to real property located outside the deeded area. Accordingly, even if the Encroachments are located on the USFS's property, they do not constitute a challenge to the Plaintiffs' title. *See Trinder v. Conn. Attorneys Title Ins. Co.*, 2011 VT 46, ¶ 18, 189 Vt. 492, 22 A.3d 493 ("The fact that homeowners' septic system is partially located on the museum's land created no challenge to homeowners' title to the property described in their deed. Homeowners hold title to their property free and clear of any adverse claim. No party asserts an interest in the land described in homeowners' deed.") (citing *Manneck v. Lawyers Title Ins. Corp.*, 33 Cal. Rptr. 2d 771, 776 (Cal. Ct. App. 1994) (explaining that the fact that plaintiffs' improvements encroached on their neighbor's land did not implicate plaintiffs' title to their property).

Because there is no challenge to Plaintiffs' title, coverage under the Policy must be triggered under some other covered title risk. CATIC and Plaintiff Johnston agree that the only applicable covered risk is the forced removal title risk which provides coverage in the event Plaintiff Johnston is "forced to remove [his] existing structure—other than a

boundary wall or fence—because . . . it extends on to adjoining land or on to any easement." (Doc. 1-5 at 1.)

In *Trinder*, the Vermont Supreme Court examined when a forced removal takes place and in doing so examined a policy provision identical to the one at issue in this case. In that case, a museum owned and occupied real property upon which the homeowners' septic system encroached. Initially, the museum merely notified the homeowners of the encroachment and did not "revoke permission, demand removal of the septic system or threaten legal action." *Trinder*, 2011 VT 46, ¶ 3. Thereafter, the museum expressed in writing an intent to commence a construction project that "may well compromise" the homeowners' further use of their septic system, but the museum "did not demand or threaten removal of the septic system[,]" but rather expressed a willingness to discuss the situation further. *Id.* ¶ 5. CATIC denied coverage because the homeowners' title to the property was not challenged and because a personal inspection and accurate survey would have revealed the encroachment. *Id.* ¶ 6. The homeowners brought suit naming CATIC and the museum as defendants. *Id.* ¶ 7. The museum did not countersue or request injunctive relief to have the septic system removed. *Id.* The homeowners and the museum subsequently settled the lawsuit with a boundary adjustment and certain other agreements. *Id.* ¶ 8.

After settling with the museum, the homeowners continued to pursue their claims against CATIC, seeking damages for engineering costs, the septic tank replacement, and attorney's fees. *Id.* The trial court concluded that there was no coverage under the policy because there had been no forced removal. *Id.* ¶ 9.

The Vermont Supreme Court affirmed. In doing so, it found no challenge to the homeowner's title, no forced removal, and observed that the trial court had concluded that there was "no . . . impending demolition of homeowners' septic system in this case." *Id.* ¶ 14. The *Trinder* court did not decide whether a demand for removal of the septic system in a letter would be sufficient to trigger forced removal coverage although it observed that "[t]he mere existence of homeowners' septic system on the neighboring museum property did not trigger coverage *until homeowners were forced to remove the*

9

*offending structure.*" *Id.* ¶ 15 (emphasis supplied). Accordingly, uncertainty regarding the possibility of a forced removal did not create coverage where it did not otherwise exist. *Id.* ¶ 13 (observing "[t]hat homeowners wished to resolve the uncertainty before the situation reached that level is understandable, but does not result in coverage that is beyond the terms of the policy"). In reaching these conclusions, the *Trinder* court cited with approval two cases that required an actual or imminent forced removal before coverage under the "forced removal" policy provision is triggered. As the *Trinder* court explained,

> Our construction of the policy's language is consonant with the decisions from the few other courts that have addressed similarly worded forced removal clauses in title insurance contracts. In [*Manneck*], the insureds sought a declaratory judgment requiring their title insurance company to prosecute an action on their behalf to resolve the problem that their swimming pool and deck were constructed on their neighbor's property. The insureds sought coverage based on a forced removal provision. The court concluded that the language of the policy was clear and the insurer had no duty to pursue an action "when made aware of the mere potential, rather than the present existence, of the forced removal of [the insureds'] improvements." The court explained that *the insurer had no obligation under this covered risk until "a court order requiring removal or the imminent destruction of the encroaching improvements by bulldozers."* Similarly, a Minnesota appellate court held that a title insurance company had no duty to defend under a forced removal clause where there had been no demand for the insureds to remove the structures that encroached on neighboring property. *Fee v. Stahley*, 2008 WL 4849844, at *4 (Minn. Ct. App. Nov. 10, 2008) (unpub. op.). As the court explained, "*[t]he policy covers actual loss, and because [the insureds] have suffered no loss, their claim is currently either improper or premature.*"

*Trinder*, 2011 VT 46, ¶ 15 (emphasis supplied) (internal citations omitted).

In this case, the court must predict whether the Vermont Supreme Court would hold that a letter from a neighboring property owner, here the USFS, demanding the removal of alleged encroaching structures is sufficient to trigger the forced removal coverage provision in the facts and circumstances of this case. The court predicts that it would not. Although it is true that the USFS's demand is unequivocal and sets forth a deadline of May 31, 2013 for the Encroachments' removal, the USFS offered to adjust

10

this deadline if more time is needed. In the letter, the USFS does not threaten either a lawsuit or imminent destruction of the Encroachments but merely states that if Plaintiffs "have not completed this work by the above date we will proceed accordingly." (Doc. 1-7 at 2.)

Plaintiffs did not remove the Encroachments by the USFS's deadline or at any time thereafter. The Encroachments have neither been destroyed nor is their destruction imminent. Plaintiff Johnston has thus not suffered an actual loss under the Policy. Although it is certainly possible that the USFS may take legal action to obtain the Encroachments' removal, it is equally possible that the USFS may conclude that a lawsuit to obtain the removal of minor encroachments into an otherwise vast tract of federal lands is not a prudent use of taxpayers' resources. This is especially true because the USFS does not risk losing title to the land upon which the Encroachments are allegedly located through adverse possession. *See Benson v. Hodgdon*, 2010 VT 11, ¶ 14, 187 Vt. 607, 992 A.2d 1053 ("Public lands generally are statutorily exempted from adverse possession, even if such possession is open and notorious"); 12 V.S.A. § 462 (stating that the statute of limitations for recovery of lands does not "extend to lands given, granted, sequestered or appropriated to a public, pious or charitable use, or to lands belonging to the state").

To require courts, property owners, and insurance companies to parse every demand letter in order to discern whether a threatened removal is sufficiently serious to trigger coverage would invite coverage disputes where none exist, prompt property owners to file lawsuit when a forced removal may never actually take place, and embroil the courts in a virtually impossible task of separating serious and viable threats from mere posturing. The court thus predicts the Vermont Supreme Court would require something more than a letter merely demanding removal of encroachments like the one at issue here.[2] This conclusion is consistent with the plain language of the Policy which provides

---

[2] The *Trinder* court cited with approval decisions that have concluded that "something more" may consist of a lawsuit seeking an order of removal (at least insofar as the duty to defend is concerned), a court order mandating removal, imminent destruction of the offending structure, or actual loss.

11

coverage only when the insured is "forced to remove [his or her] existing structure—other than a boundary wall or fence—because . . . it extends on to an adjoining land or on to any easement." (Doc. 1-5 at 1.) *See Vt. Mut. Ins. Co. v. Parsons Hill P'ship*, 2010 VT 44, ¶ 21, 188 Vt. 80, 1 A.3d 1016 ("When interpreting an insurance contract, [courts] rely principally on the plain, ordinary, and popular meaning of the disputed terms."). Here, as in *Trinder*, "[t]he mere existence of [the Encroachments] on the neighboring . . . property [does] not trigger coverage until [Plaintiffs are] forced to remove the offending structure[s]." *Trinder*, 2011 VT 46, ¶ 15.

Summary judgment in CATIC's favor is thus hereby GRANTED on the ground that there is no duty to defend or duty to indemnify under the Policy until a forced removal is either imminent or has taken place. Plaintiffs' cross-motion on this same issue is DENIED and Plaintiffs' motion for declaratory relief and breach of contract claims are hereby DISMISSED.

### C.     Whether the Survey Exception Applies.

Because the court has granted summary judgment in CATIC's favor on Plaintiffs' declaratory judgment and breach of contract claims, it need not reach the issue of whether the survey exception applies. However, as Plaintiffs are claiming that CATIC handled Plaintiff Johnston's claim in a manner that violated the implied covenant of good faith and fair dealing claim, and because CATIC requests judgment in its favor on this claim, the court briefly addresses the survey exception. It does so solely for the purpose of determining whether it renders the Policy's forced removal coverage illusory, whether the survey exception is unconscionable, and whether CATIC is estopped from raising the survey exception as a defense to coverage in this case.

"Title guaranty companies, almost without exception, issue their policy of guarantee subject to conditions shown by a survey or if no survey is made, then subject to such condition as an accurate survey will disclose." *Amidano v. Donnelly*, 615 A.2d 654, 659 (N.J. Super. Ct. App. Div. 1992) (internal quotation marks and brackets omitted); *see also* 1 Title Ins. Law § 7:8 (2013-2014 ed.) ("An exception for what an accurate survey or inspection of the premises would reveal has been standard in owner's title insurance

12

policies and often appears in loan policies as well."). As the Supreme Court of New Jersey explained,

> The purpose of the survey exception is to exclude coverage when the insured fails to provide the insurer with a survey. From a search of relevant public records, a title company cannot ascertain the risks that an accurate survey would disclose. It is for this reason that the title company puts that risk on the insured, who can control it either by obtaining a survey or arranging for the elimination of the survey exception. Thus, the very purpose of a survey exception is to exclude from coverage errors that would be revealed not by a search of public records, but by an accurate survey.

*Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 217 (N.J. 1989) (internal citation omitted); *see also Bennett v. Investors Title Ins. Co.*, 635 S.E.2d 649, 659 (S.C. Ct. App. 2006) (collecting "a legion of case law [that] recognizes title insurance policies using survey exceptions").

In general, courts have held that similar or identical survey exceptions to that set forth in the Policy are unambiguous and enforceable. *See, e.g., Walker Rogge, Inc.*, 562 A.2d at 216 ("At the outset, we find that the survey exception is neither vague nor unenforceable."); *Heyd v. Chicago Title Ins. Co.*, 354 N.W.2d 154, 157 (Neb. 1984) ("Th[e] survey exception is expressed in language having plain and ordinary meaning. Therefore, correct location of any structure on the described premises is not a risk or loss covered by Chicago's policy of title insurance."); *Muscat v. Lawyers Title Ins. Corp.*, 351 N.W.2d 893, 895-96 (Mich. App. 1984) (holding the "'accurate survey' exception" was enforceable as it was "clearly expressed in the policy and was not inconspicuous"); *see also Panciocco v. Lawyers Title Ins. Corp.*, 794 A.2d 810, 814 (N.H. 2002) (finding that insured's claims "were expressly excepted from coverage by the policy's unambiguous language" under Schedule B, "and thus the plaintiff could not reasonably expect coverage").

Moreover, contrary to Plaintiffs' contention, courts generally do not distinguish between "surveys" and "survey plats" for coverage purposes. Plaintiffs' reliance on *Neal v. Brown*, 649 S.E.2d 164, 169 (S.C. Ct. App. 2007) for this proposition is misplaced because that case was overruled by the Supreme Court of South Carolina, which held that

"the distinction between a 'survey' and a 'plat' is illusory." *Neal v. Brown*, 682 S.E.2d 268, 270 (S.C. 2009).

Plaintiffs contend that *Pharmacists Mutual Ins. Co. v. Myer*, 2010 VT 10, 187 Vt. 323, 993 A.2d 413 nonetheless supports a conclusion that the survey exception is unenforceable because it would "gut the forced removal coverage" as an accurate survey would always disclose encroaching structures. (Doc. 12-3 at 9.) Plaintiffs cite *Glassford v. BrickKicker*, 2011 VT 118, 191 Vt. 1, 35 A.3d 1044 for the further proposition that the survey exception is "unconscionable" because the coverage offered for forced removals is illusory. (Doc. 12-3 at 16.)

In *Myer*, the Vermont Supreme Court refused to construe a homeowner's insurance policy exclusion for defamatory statements that the insured "'had reason to believe'" were false as embodying a negligence standard because to do so would "virtually eviscerate the coverage provision for 'misrepresentation, libel, slander, defamation of character, or invasion of privacy.'" *Myer*, 2010 VT 10, ¶ 10. The court held that "[i]t is axiomatic that constructions of exclusionary clauses to nullify coverage provisions are not reasonable." *Id.* It therefore construed the exclusion to apply to only intentionally defamatory statements.

In *Glassford*, the Vermont Supreme Court found a home inspection contract unconscionable based on its "illusory remedy for any claim for damages resulting from its provisions limiting liability to the inspection fee and requiring binding arbitration costs that would exceed the amount of the liability limit." *Glassford*, 2011 VT 118, ¶ 13. The court held that the liability limit was "really an exculpatory clause insulating the home inspector from all liability" for negligent or even intentional torts. *Id.* ¶ 16.

Here, in contrast, Plaintiff Johnston could have negotiated for the removal of the survey exception but did not. *See First Am. Title Ins. Co. v. Dahlmann*, 2006 WI 65, ¶¶ 26-28 & n.14, 291 Wis. 2d 156, 715 N.W.2d 609 (discussing the practice of negotiating the removal of the survey exception from title insurance and purchasing extended coverage). Moreover, nothing requires a title insurer to conduct its own survey as a condition precedent to offering title insurance; instead, the decision to request a survey in

advance of a purchase lies squarely with the insured. *See Walker Rogge, Inc.*, 562 A.2d at 217 (explaining that the insured bears the "risk" of purchasing insurance without "obtaining a survey"); *Heyd*, 354 N.W.2d at 156 (holding that "an insurance company has no obligation to obtain a survey of the subject real estate before a policy of title insurance is issued" absent an agreement or a policy provision that dictates otherwise); *Kuhlman v. Title Ins. Co. of Minn.*, 177 F. Supp. 925, 926 (W.D. Mo. 1959) ("It is very apparent that the [title insurance company] was under no obligation to cause a survey to be made prior to issuing the policy[.]").

Although the survey exception limits forced removal coverage in the event an encroachment would have been revealed by an accurate survey or personal inspection, it does not render that coverage wholly illusory. Coverage remains available for forced removals on alternative grounds such as a structure built in violation of zoning laws or built without a building permit. The instant case may thus be distinguished from both *Myer* and *Glassford*.

Plaintiffs nevertheless argue that, if the survey exception would always negate coverage for forced removals arising from an "existing structure" that "extends on to adjoining land or on to any easement" (Doc. 1-5 at 1), the coverage for that category of forced removals remains illusory because this "begs the question: When would a structural encroachment **not be disclosed** by an accurate survey?" (Doc. 12-3 at 5.) CATIC responds that an accurate survey is unlikely to reveal "subterranean encroachments," such as septic fields, submerged fuel tanks, utility lines, and underground footings. (Doc. 20 at 5.) In turn, Plaintiffs assert that the doctrine of judicial estoppel forecloses CATIC's subterranean argument because CATIC took the opposite position in *Trinder*, where it argued that "'[a]n accurate survey would have depicted and revealed . . . the Trinder septic tank and/or field.'" (Doc. 29 at 3) (quoting Appellee's Brief at 27, *Trinder*, 2011 VT 46).

"[Judicial estoppel] typically applies when, among other things, a party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception

15

that either the first or the second court was misled." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170 (2010) (internal quotation marks omitted). "In this Circuit, judicial estoppel applies only when a tribunal in a prior *separate* proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision." *Adler v. Pataki*, 185 F.3d 35, 41 n.3 (2d Cir. 1999). Although the decision in *Trinder* noted that, "[a]ccording to [CATIC], a survey and inspection would have revealed the encroachment," *Trinder*, 2011 VT 46, ¶ 6, the *Trinder* court did not rely on or adopt CATIC's argument in deciding the case. *See id.* ¶ 22. Judicial estoppel is thus inapplicable and does not bar CATIC from arguing that an accurate survey does not reveal every encroachment.

      However, just what an accurate survey would reveal in the facts and circumstances of this case is unknown. As CATIC, albeit belatedly, admits in its reply, the USFS's depictions of the Encroachments fall short of a formal survey. Neither party has provided evidence, from an expert witness or otherwise, regarding what an accurate survey would typically reveal or what it would reveal in this case. The administrative standards for surveyors relied upon by Plaintiffs do not appear to require depiction of encroachments or even structures for a survey. The Policy, itself, provides only minimal guidance because it states that the survey exception is triggered when an encroachment is one that "an accurate survey . . . of the land would disclose." (Doc. 1-5 at 5.) The Policy defines the term "land" to include "the land . . . described in Schedule A and any improvements on the land which are real property." *Id.* at 2. This, in turn, raises the question of which "improvements on the land" are real property and how this determination is made. A personal inspection of the Property would undoubtedly reveal the Encroachments, but it would provide no notice to Plaintiff Johnston that they allegedly extend onto adjoining land.

      Against this backdrop, the court cannot determine whether an accurate survey would disclose the Encroachments. The court thus proceeds no further with determining whether the survey exception applies. It concludes, however, that there was no violation of the implied covenant of good faith and fair dealing in CATIC's raising the survey

exception as a defense to coverage notwithstanding any position it took in *Trinder*. *See Post v. Killington, Ltd.*, 2010 WL 3323659, at *17 (D. Vt. May 17, 2010) (granting summary judgment and concluding, as a matter of law, that ski resort did not breach the implied covenant when it merely exercised its rights under a contract), *aff'd*, 424 F. App'x 27 (2d Cir. 2011).

### D.   Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Plaintiffs argue that CATIC attempted to undermine or destroy Plaintiff Johnston's rights under the Policy when it advised his counsel that inviting the USFS to file suit in order to trigger coverage "may be considered to be a violation of" the provision excluding "Title Risks that are created, allowed or agreed to by the Insured." (Doc. 1 ¶¶ 31, 69) (internal quotation marks omitted). CATIC contends that this allegation fails to demonstrate bad faith because CATIC merely advised Plaintiff Johnston of the potential consequences of such actions under the Policy.[3]

Pursuant to Vermont law, "a covenant of good faith [and fair dealing] is implied in every contract." *Carmichael v. Adirondack Bottled Gas Corp.*, 635 A.2d 1211, 1216 (Vt. 1993). "The covenant's purpose is to ensure 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Lopresti v. Rutland Reg'l Health Servs., Inc.*, 2004 VT 105, ¶ 36, 177 Vt. 316, 865 A.2d 1102 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)).

In opposing summary judgment, a party asserting an implied covenant claim must point to admissible evidence from which a rational juror could find in the party's favor:

> To carry its burden for the good-faith-and-fair-dealing claim, [the plaintiff] must produce evidence that could lead a reasonable jury to conclude that

---

[3] CATIC's additional argument, that Plaintiffs' implied covenant claim fails as a matter of law because it is duplicative of the breach of contract claim, is moot in light of the court's decision to grant summary judgment in CATIC's favor on Plaintiffs' breach of contract claim and its subsequent dismissal of this claim. The court therefore does not consider whether the two claims are based on the same conduct. *See Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 893 A.2d 298 ("[W]e will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct*.").

> [the defendant] breached an implied-in-law promise not to do anything to undermine or destroy [the plaintiff's] rights to receive the benefit of the parties' agreement. . . . Good faith is ordinarily a question of fact. However, plaintiff must provide a basis on which the fact finder can find a violation.

*R & G Properties, Inc. v. Column Financial, Inc.*, 2008 VT 113, ¶ 46, 184 Vt. 494, 968 A.2d 286 (internal quotation marks omitted).

In this case, the Policy excludes coverage for "Title Risks . . . that are created, allowed or agreed to by [the insured]." (Doc. 1-5 at 2). CATIC's letter to Plaintiff Johnston's counsel merely noted this provision of the Policy and explained the potential consequences of encouraging the USFS to sue. Both the tone and the content of the letter are professional, non-threatening, and non-coercive. CATIC was free to assert its rights under the Policy, and Plaintiffs cannot claim a "justifiable expectation" that CATIC would do otherwise. *Southface Condo. Owners Ass'n, Inc. v. Southface Condo. Ass'n, Inc.*, 733 A.2d 55, 58 (Vt. 1999) (holding "[b]ad faith cannot be inferred from the expected course of business" and explaining that, "[i]f bad faith infiltrated [a] transaction, it must appear that [the parties] acted beyond merely observing the terms of the [contract]"); *see also Vescio v. Merchants Bank*, 272 B.R. 413, 442 (D. Vt. 2001) (holding that "actions expressly authorized under the terms of the loan agreement," including the bank's "exercise of its assignment of rents," did not constitute bad faith); *Badgett v. Security State Bank*, 807 P.2d 356, 360 (Wash. 1991) ("As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms."), *cited with approval in Killington, Ltd. v. Richards*, 641 A.2d 340, 342 (Vt. 1993) (mem.).

Plaintiffs do not identify any other conduct by CATIC that "violate[s] community standards of decency, fairness or reasonableness." *Carmichael*, 635 A.2d at 1216 (internal quotation marks omitted). Accordingly, drawing all reasonable inferences in Plaintiffs' favor, the facts "do not come close to providing a basis on which a jury could determine that the covenant of good faith and fair dealing has been violated." *Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶¶ 12-13, 175 Vt. 413, 834 A.2d 37 (finding summary judgment was properly granted to a defendant who neither abused its authority

nor lacked a reasonable basis for its actions with respect to the plaintiff). The court therefore GRANTS summary judgment in CATIC's favor on Plaintiffs' implied covenant claim (Count VIII).

## CONCLUSION

For the reasons stated above, the court hereby GRANTS CATIC's motion for summary judgment (Doc. 7) and DENIES Plaintiffs' cross-motion for partial summary judgment. (Doc. 12.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 16th day of April, 2014.

*/s/ Christina Reiss*

Christina Reiss, Chief Judge
United States District Court